Your Honors, and may it please the Court, my name is Thomas Scott Railton, and I represent the appellants in this case, Mr. and Mrs. Olson. And if I could, I would like to reserve five minutes for my rebuttal. Okay, watch your clock. Washington State strictly regulates reverse mortgages, and it does so because these are risky and complex financial products. If they go unregulated, people can lose their homes, or they can lose home equity that they spent decades of their lives diligently building up. Now, Unison's product meets the key terms of reverse mortgage. It functions like a reverse mortgage, but it does not comply with the protections that Washington determined are necessary to protect homeowners like the Olsons. And as a result, the Olsons stand to make no money for a home that they've been paying off since the 1980s. This violates Washington law in three distinct ways. First, Unison's product is a reverse mortgage under the Consumer Loan Act, where at the very least it's just a general residential mortgage. Either way, it doesn't comply with the relevant protections, including usury laws. Second, even if Unison has designed its product to slip through the cracks of the Consumer Loan Act, that's just what the broad protections of the Consumer Protection Act prohibit, conduct that poses the same kinds of risks as regulated conduct, but that, quote, eventually evades regulation. And third, Unison's marketing practices have been consistently identified by both Federal regulators and commentators as deceptive, and that also violates the Consumer Protection Act. And finally, while this Court can decide this appeal under general principles of Washington law, it also meets the criteria for certification. It involves novel, complex, and dispositive questions of State law that will affect dozens, if not hundreds, of Washington homeowners. So we ask that the Court reverse. Turning to the question of whether Unison's product is a reverse mortgage under the Consumer Loan Act. So under Washington law, a reverse mortgage has the following features. A homeowner is given a cash advance. They turn over a deed of trust in their dwelling. And on three triggering conditions, whether they die, sell the home, or move out, payment comes due. And that payment can take several forms. It's written in the disjunctive. That payment could be any principle. It could be interest. Or it could be shared appreciation or equity in the home. What are the specific things that make it unlawful if it qualifies as a— their actions unlawful if it qualifies under that definition? There are a variety of things. So, first of all, it would violate usury laws because of their interest that they would receive. It's at this point, I think, about 40 percent annual interest. It violates requirements that Unison ensure that homeowners receive independent counseling from a HUD-approved counselor so that homeowners can understand what they're getting into when they put their homes on the line. There's also a requirement, directly or indirectly, that homeowners purchase insurance. Unison is also not licensed as a lender. So there's a number of statutory requirements that Unison would violate if it does, in fact, fall under the statute. Now, Unison's main argument on the statutory text is that this product doesn't fall within the definition of the term credit, which is in a threshold clause in the statute, which says a reverse mortgage loan is a non-recourse consumer credit obligation. But— But they argue that it's not even a loan, that because the — your clients don't So their argument, as I understand it, is that I think they think credit and loan are sort of coextensive. And so under the statutory text, they say it needs to qualify as a credit in order to meet the other criteria, because otherwise, if you look at the specific criteria that the reverse mortgage statute sets out, all of those are met. There is an advance. There's a deed of trust in the borrower's dwelling. There's a payment requirement that becomes due upon these three conditions. And that payment can take various forms, and it could just be shared appreciation or equity in the home, which, of course, are going to vary with the amount of the home. So Unison's whole argument rests on this idea that the single-word credit in this threshold clause that then gives specific definitions isn't met. And that's wrong both as a matter of credit generally, but here we actually have a statute that tells us exactly what kind of credit obligation the Washington legislature had in mind. And so credit is a quite broad term. It's giving the provision of money with expectation of future payment. That could mean a lot of things, but here the statute tells us what that future payment is. Normally, it would be repayment under traditional definitions of credit. I think that's their argument, is that there's no — there's no obligation to repay, no extension of money at the beginning. Well, so here, I mean, the plain-text definition of credit is just future payment. It doesn't require repayment. And that's actually consistent with the plain-language definition of debt, which could also be relevant, which is, you know, being under obligation to pay or repay someone or something in return for something given. But here we actually have a statute that tells us exactly what kind of payment obligations the legislature had in mind, and it is any principal interest or shared appreciation or equity. And so because that's written in the disjunctive, Washington's statutory interpretation follows the same principles as Federal statutory interpretation, and it says that could be satisfied in various ways. So the legislature is telling us when that expectation of future payment, it could take the form of sort of the most traditional idea about principal, or it could take the form of shared appreciation or equity. And those are things that are going to vary significantly with the value of the home. If it's just a shared appreciation payment requirement, if there's no appreciation, the lender could end up with nothing, and that's right under the statutory definition. If it's equity in the home, that's the payment obligation, it could go up and down with the value of the home. So is it your position that all option contracts constitute reverse mortgages? Absolutely not. And so here — Give me an example of one that wouldn't. So under this statute, you would need to have, first of all, a deed of trust secured by the obligation. So any option that isn't secured by a deed of trust, automatically you don't fall under the statute. And I will say it's telling that Unison identifies various Washington court decisions that describe options generally, but none of them involves a deed of trust. And that makes sense, because a deed of trust is an extremely Supreme Court has explained, this is in Clem at 1185, with a deed of trust, land is conveyed to a trustee as security for credit or a loan the lender has given the borrower. If you look at the very cases that Unison itself cites in its brief at page 29, they cite a case White for the proposition that a mortgage, that a deed of trust creates nothing more than a lien. And then they cut off the second hand of that sentence, which is nothing more than a lien in support of the debt which it is given to secure. So what the difference here is, I take it, is that because they have the deed of trust, they can — Unison can declare a default based on some breach, maybe of keeping the place repaired in good shape, and then foreclose and sell the home. Is that the difference here? That is one of the differences. I mean, also, any option that didn't have these three triggering criteria would also not qualify, because the statute is very specific about the kind of credit obligation it has in mind. So a regular option that looked like over the course of the next month you can give us X amount of money for this property, that certainly wouldn't meet the statutory definition. So here you have a much more specific kind of financial instrument in mind. And then I will just say, even if this Court were to conclude that this doesn't fall under the specific definition of a reverse mortgage, or it doesn't even fall under the definition of a mortgage generally, despite the relevant agency's explanation that it does, and that's an explanation to which Washington courts would give great weight if there's any ambiguity on that point. But even if you put that aside, that's exactly where the Consumer Protection Act comes in. And so it exists specifically, as the Washington Supreme Court has repeatedly explained, you know, even if a practice is not regulated by the statute, so long as it offends public policy as has been established by statutes, the common law, or otherwise. Sotomayor, are these alternative theories? If we were to agree with you that it meets the definition, statutory definition of a reverse mortgage and is therefore covered by those provisions, would that preclude reliance on this particular alternative theory? So if it is covered by the Consumer Loan Act, that's a per se violation of the Consumer Protection Act. Okay. And so this is just sort of a secondary. If it's not covered by a statute, there's this gap-filling rule that comes in. Okay. So if it is covered by the statute, then that claim goes away. You wouldn't need to rely on it. Okay. That's right. You have three alternative theories for what this product is. Yes. I mean, there's — I think there's three theories as to reasons why it falls under the statute, it meets the statutory definition, and then there's the Consumer Protection Act that exists to fill gaps. But if we were to agree — I'm just trying to understand the relationship of the arguments. If we were to agree that it's covered as a reverse mortgage under the statute, then we wouldn't have to reach the issues about, you know, whether it fit within this alternative doctrine about things that aren't regulated, but that sort of deceptively go around or that. But if the statute — I think if this Court were to hold as a matter of law that it's a reverse mortgage under the statute, I believe that's right. Because we're at the motion-to-dismiss stage, you know, if the Court was just to say it's plausible that it's a reverse mortgage, then maybe you wouldn't — the other claim, you wouldn't want it to drop away. I see. So if it turned on facts that could change, then you might need the other — okay. Right. And I'd like to reserve the balance of my time. Thank you very much. All right. Thank you very much, counsel. May it please the Court. I'm Jeremy Creelan here, representing Defendant Appelli Unison. Thank you. I'd like to — to begin by noting, essentially, the — the plaintiff's appeal here really is remarkable for the ways in which it — it departs completely and is contradicted by the allegations, the plaintiff's allegations in the complaint. And that really is — shows the problem here with this appeal. With respect to the first claim, the Per Se Consumer Protection Act claim, the plaintiffs alleged in their complaint that the Unison product, the homeowner agreement, did not meet the criteria, the statutory criteria in Washington for a reverse mortgage loan. That's at — at 4.26 of their complaint. And, of course, that is the reason why the legislature in Washington this past session considered and has so far declined to add home equity-sharing products to the definition of reverse mortgage loan under the various statutes that we're talking about. Legislature is in the process of considering that. They've declined to do so. They, of course, wouldn't be considering that if it were already covered. And that is dispositive here of the Per Se Consumer Protection Act claim. The alternative, then, for the plaintiffs here is essentially inequity, and I'm going to get to the deception and unfairness, you know, claims in a moment. But on the Per Se claim, the only alternative is to urge this Court to invoke equity and recharacterize the Unison product, the homeowner agreement, as a reverse mortgage loan or a mortgage loan in some way. But, of course, the only — Even if it isn't a reverse mortgage, the amicus brief from the Washington State Department of Financial Institutions argues that it is a mortgage, because whatever it is, the money that it advances is secured by a deed of trust. Well, two — two points there, Your Honor. First, the Washington agency, DFI, testified before the legislature urging it to amend the statute to include these types of products in the statute. So in the context of the legislative hearings, they did not think that it was already covered. I want to ask you why we should be considering legislative hearings where there's no law that's been enacted or not enacted. I mean, is that even something our Court can consider? I mean, it's not — it's not a law. It's something outside the laws we have in front of us in the complaint, and we can't take judicial notice of anything that's said because it's not reliable. So why are you raising that? Well, I raise it only for the — for that very point, Your Honor, which is that respectfully, this Court should not substitute its policy judgments as to whether this, you know, product should or shouldn't be covered, and thus should be — should or shouldn't be considered a per se Consumer Protection Act claim. So it's very relevant to the question of the per se complaint — per se claim, because the per se Consumer Protection Act claim depends on the violation of a statute. So the question of whether this product is in or out of that statute is directly relevant. The legislative — of course, the Court can take judicial notice of the fact that the — that the legislature is considering this. And in the case of Schwab, Safety Schwab, and also the Greenberg case, the Washington courts made clear that the courts should — should defer to the legislative process and not substitute its policy judgment. The statute as it's written. Right. And what — what element of the definition of reverse mortgage loan is not satisfied here? The — the nonrecourse consumer credit obligation, the word credit is essentially read out of the statute by the plaintiffs here. And the word credit, the statute was based — How is it read out? Because money is given up front, and then you get a deed of trust, and there is an expectation that you'll share in the appreciation of equity, and you're going to get that back. No, but the deed of — There's an expectation of payment that's tied to the type of interest identified in the statute. This is important, Your Honor. The deed of trust does not secure the — any kind of repayment obligation. There is absolutely no obligation to repay anything. The deed of trust — and here there's a — this is important clarification. In some States, deed of trust is referred to as a mortgage. But every mortgage loan is a mortgage, but not every mortgage is a mortgage loan. The key is the loan. This is not a loan. There is no obligation to repay anything. What — what it is, and this is — this is why TILA, which is the Federal statute that this Washington State statute was based upon, identifies in the commentary that options are not considered credit. The difference is that with an option, what is given and what was given here by the Olsons is, in exchange for the initial investment payment of $65,000 — $64,750, at a future time when the — when the — typically when the — when the property is sold by the — the homeowner, then the unison has the option of paying an additional payment, the balance of the purchase price. Here it would be $194,000. And in exchange, obtaining 70 percent of the sale proceeds when the property is sold. But if the market — at the time in 2019 when this deal was made, and it was explained clearly in the — you know, in the documents, in the offer and in the contracts, it was unclear whether that would mean — whether the market would go up or down. And if the market goes down, unison can decline to — to exercise the option, and the — the homeowner, the Olsons here, walk away with $64,750 free and clear with no obligation, no principal at payments, no interest. They never pay anything. So that is the — that is what credit, which is defined as debt in — in TILA, that is the key difference here. Sotomayor, what's the function of the deed of trust here? Well, so the — so the deed of trust secures the non — nonfinancial obligations, if you will, of the — of the homeowner. In other words, the obligations to — to pay their taxes, to — to keep — upkeep the home. If they — if a tree falls on the property and just, you know, starts to — water starts to leak in, there's an obligation to — to repair it so the value is not lost. And it's — it's important to note, on appeal, the — the — the plaintiffs here suggest a parade of horribles of all these terrible things, you know, none of which are alleged in the complaint, mind you. But these are all things designed to preserve and protect the value for — not only for unison, but for the homeowner. These things like if your tree — if a tree falls on the property, making sure that, you know, it doesn't — the property doesn't get destroyed, you know, by mold or whatever, these kinds of — of things. So this deed of trust, in some States they're called mortgages, but that doesn't mean they're loans. In Washington State it's called a deed of trust, secures those obligations. But they're not securing any repayment of anything. So just walk me through this. Yep. Let's say there's mold. How do you — how do you enforce the deed of trust? Are you going to foreclose on the house? No. And it's notable — So it's essentially — I just don't understand how the taxes, mold, tree falling on the house, how you would — how that plays into the deed of trust. So it's notable that in unison's history, there's no — there's never been a foreclosure in Washington, and there's only been one in the entire country for very inapposite, peculiar circumstances. Talking about for un — by unison? Unison, right. There's never been a foreclosure. And the reason why there isn't, there's — and this gets to your — to your question. These sorts of — these obligations to preserve the property's value, usually what happens is, when the — when and if the property is sold, there's kind of a true-up in the sense that if — if there's deferred maintenance that wasn't done, you know, on the property, then that — it can come out in the appraisal, and there might be an adjustment to the, you know, purchase price. In the rare cases, the deed of trust allows unison, if the tree falls and the property owner doesn't repair the home, to step in and make that repair, and then seek payment for that repair, either immediately or later when the home is sold. But that is the rare — you know, that's the tail on the dog. That's not the dog. No, with the extension of credit. Well, with respect to the — with respect to the — I mean, if you — if your client comes in and says, okay, I'm going to — I'm going to repair the damage of the tree falling on the house, and I'm going to collect later, that's an extension of credit, isn't it? But — but this is the important distinction you're making. Is that a yes or a no? I'm — I'm just trying to — it would — I understand your point in that it could demand the repayment, and it could even seek interest on that payment, which — but the point is, that's not the product here. That's — that's this extra element. That's not the core product we're talking about. And I — and I think it's important to — I understand that, but you're answering Judge Collins' question about what is the function of the — of the trust — deed of trust. And your answer was, it protects taxes, it protects the falling-on-trees, it protects all these other things. And I'm just trying to play out how that happens. And it's — your answer seems to be, that doesn't come into play until the option is exercised or not exercised. The — it depends on the circumstance. And it's — the most important thing for this appeal is that none of these things have happened with the Olsons. They're not alleged. They haven't — they haven't occurred. And, in fact, there's no — Why would that have to occur in order to meet the statutory definition of a reverse mortgage? Well, it — That's a different argument. That's a factual argument, isn't it? No. The point is that if — if the allegation — if the argument is that these things are — these factual scenarios are somehow the important element that turns this from an option into a loan, then it's reasonable for the district court to look at the complaint and say, well, were these things even alleged, or are these attorneys' arguments on appeal that are fanciful? And there's a reason why they aren't alleged. They don't occur, you know, very often. That's not the typical situation. And it certainly didn't happen with respect to the Olsons. What the Olsons got here, and this is what is alleged, is that they were — they got the flyer indicating that this product, unlike a loan, does not have interest payments or principal payments at all. And, in fact, they allege, and this is critical, they allege that the reason why they took this product and they — they engaged in this agreement is that, unlike a loan, it — they needed money and they didn't have — they wouldn't get refinancing. They had just refinanced the year before, they said. And one of the things that was appealing about this is that it — unlike a loan, it wouldn't have those payments. Here's the — here's the problem I am struggling with, with your argument, which is that if you look at the definition of a reverse mortgage loan, it has all of these particular features that are listed. And you have all of those. And then you want to say that the general term, credit obligation, actually limits those terms further. And that seems — I'm not sure that's a correct reading of the statute, because it seems that if you have a deed of trust that gives a security interest and you have a shared — a shared appreciation or equity that is due and payable under the prescribed circumstances, that that's the type of thing it's capturing. It's suggesting that that is a credit obligation. But — well, respectfully, Your Honor, the credit obligation, that word, which sets up these conditions, is so central to the definition of reverse mortgage loan. I mean, the word loan is the key. And to read it out of that definition is to read — is to literally to open it up to any kind of product where there's, you know, a payment of money and any — almost any kind of after effect. You know, because of the deed of trust, it's really unusual to have a deed of trust with an option. But it doesn't secure any repayment. It doesn't secure any kind of repayment of any of the money that was — that was paid. It's a deed of trust only to secure these other obligations. And that's the key. It's not debt. There's no repayment obligation on the part of the consumer. That's both why the Olson's engaged in it and, frankly, what provides such benefits that this product provides such benefits to consumers. But this doesn't — this deed of trust does not secure one or more advances? No, it does not. It does not secure any of — any repayment of anything. There's an investor payment, which the Olson's got, the $64,000 payment. They don't have to repay that, nor do they have to repay any other monies, you know, as part of this. The deed of trust only secures these other obligations to keep the property, you know, to make it — to stay in the property. In other words, to make it your primary residence so you're not an investor, you know, just looking for short-term financing, to, you know, pay your taxes and all these other obligations. It does not secure the fundamental — the crux of this product. And that's why, you know, it's not — it's an option and not a loan. And Waitila itself, you know, defines options as not being credit, not being included. The — I just want to address one or two more other things. The — with respect to the Consumer Protection Act and the notion of, you know, the Court including this, even though it's not counted in the statute, the Consumer Loan Act statute, that this Court is urged by plaintiffs to consider it covered by the Consumer Protection Act, if you read Schwab and Greenberg, and Greenberg was highlighted by the plaintiffs here, those cases, not only in all the cases that the plaintiff cites, the circumstances, not only do the courts make clear that the court should defer to the legislative process and not substitute its policy judgment, but also in the case of Schwab, there's a situation where the conduct, the residential the landlord's conduct was already covered by the Washington statute. And the — and the Court said, we're not going to — we're not going to step in where the legislature can do its job and include it. We're just going to defer. And that's what we respectfully urge the Court to do that here. I think my time's up. Thank you. All right. Thank you very much, counsel. Mr. Scott Relton. Thank you, Your Honors. One thing I'd just like to say at the outset as to Judge Collins' questions is we would ask that this Court allow every claim to survive just because there could be factual issues that come up down the road. What's your response to his argument that this deed of trust doesn't secure one or more advances because it carves out the investment payment from the obligations? So I'll point the Court to the deed of trust itself. And so this is at 1 E.R. 6364. And so if you look — 6364? Correct. The Court looks at what is being secured. It's the grantor's performance under the agreement, so that's the Olson's. And then there's a long list of things. It includes the payment of obligations, and it includes the payment of the investor interest, which is the equity or shared appreciation that Unison would get. So that's at Romanat 5. And so what you have is the deed of trust is actually securing all of the obligations. But is it securing — it has to secure one or more advances. And what's the advance? Isn't the advance the investment payment? So that's the advance. And there are certain scenarios where that is actually a guaranteed obligation under the contract. But the deed says grantor shall not be obligated to repay any part of the Unison investment payment. So that's their argument. Does it not secure the advance? It does secure the advance. So there's two scenarios where Unison is guaranteed its advance back. So the first scenario is if the homeowner decides to sell within the 3-year window, Unison's contract guarantees that it gets the larger of its initial investment payment or the initial investment payment plus shared appreciation. And if the Olsons decide that they want to buy out of this agreement because all the conditions require them to leave their home, they then, once again, under Unison's own contract, they're required to repay the greater of the advance or the advance plus shared appreciation. So there are situations where the advance is fully guaranteed. And then the due and payable obligation is secured generally. And for reasons having to do with the nature of the housing market and equity and shared appreciation, how those will function in practice, those also effectively secure the advance. And that's certainly the case here. At this point, Unison would be getting the advance and 40 percent interest up on top of it. And so — and then I'll say with the CPA unfair practices claim, if Unison has managed to craft a product where they have secured the advance in two scenarios, if they have effectively secured the advance in all scenarios, but they managed to sneak through that specific language in the statute, that's exactly where the CPA unfair practices comes in. And as to the cases cited by my friend on the other side, the Washington Supreme Court has actually repeatedly held that it was the legislature's decision to tell the judiciary through a process of judicial inclusion and exclusion to regulate practices that are not covered by statutes. And the Court has explained that's because there is no area where, you know, human inventiveness is quite as impressive as with predatory financial products. And if the legislature were to go through and define at any given moment every single unfair practice, it would immediately become necessary to start again because practices will arise that dodge the statute. So if it turns out that they have managed to slip through that crack, that's exactly where the unfair practices claim comes in, and Greenberg supports that. Greenberg lists these three criteria for unfair practices. It says each of those criteria apply, and one of them is the one I read earlier about offending public policy as established by the statutes but not regulated. And then another is just generally immoral, unethical, oppressive, or unscrupulous. And either of those would be amply satisfied here. And the last thing I'll say about the marketing claims, there are cases where the Olsons would owe what is very clearly credit and interest if they don't make certain payments. That's included in the contract. There's a specific provision setting that amount of interest. So that certainly would be credit. And then I think it's telling that these are statements that have been repeatedly identified as misleading in the reverse mortgage lending context. And that's because the reason Unison is saying the same things as reverse lending companies is because Unison is also engaged in reverse mortgage lending. That's why it's making the same kinds of claims to consumers and has the same features of the product that consistently confuse them. All right. Thank you, counsel. Thank you. Olson v. Unison is submitted.
judges: THOMAS, WARDLAW, COLLINS